1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JESUS MORALES,

          Petitioner,

  v.

 A.K. SCRIBNER, et al.,

          Respondents.

_____/

No. 05-03545 JSW

**ORDER DENYING PETITION
FOR A WRIT OF HABEAS
CORPUS**

Now before the Court is the petition for a writ of habeas corpus pursuant to 28 U.S.C.
§ 2254 filed by Jesus Morales ("Petitioner"), a prisoner of the State of California.  After
consideration of Petitioner's claims on the merits, the petition for habeas corpus is DENIED.

**PROCEDURAL BACKGROUND**

On March 18, 2003, Petitioner was convicted of forcible rape, in violation of California
Penal Code § 261(a)(2), and forcible sexual battery, in violation of California Penal Code §
243.4(c).  (CT 220-23.)  Petitioner was sentenced to eight years for the rape, plus two
consecutive years for the battery, for a total of ten years.  (CT 231-34.)[1]  Petitioner appealed his
conviction to the California Court of Appeal, which affirmed the judgment on December 13,
2004.  *People v. Morales*, No. A102884, 2004 WL 2850547, at *1 (Cal. Ct. App. Dec. 13,
2004).  Petitioner then filed a petition for writ of habeas corpus in the California Court of

---

[1]  Citations to "CT" are to the Clerk's Transcript in the state court appeal; citations to
"RT" are to the Reporter's Transcript.

Appeal, which was denied on December 13, 2004. *Id.* at *10, n.4. The California Supreme Court denied Petitioner's petition for review on February 23, 2005. *People v. Morales*, No. S130807, 2005 Cal. LEXIS 2151, at *1 (2005).

Petitioner filed his habeas corpus petition with this Court on September 1, 2005. On October 14, 2005 and January 6, 2006, this Court issued orders to show cause. On April 13, 2006, Respondent moved to dismiss the petition. The Court granted the motion to dismiss and granted Petitioner leave to amend on June 12, 2006. On November 13, 2006, Petitioner filed an amended petition, and on December 18, 2006, this Court issued another order to show cause. Respondent filed an answer and a memorandum of points and authorities and lodged exhibits with the Court on February 15, 2007. Petitioner filed a traverse to Respondent's answer on May 21, 2007.

## STATEMENT OF THE FACTS

The California Court of Appeal summarized the facts as follows:

> The victim, Dianne, is related to defendant by marriage: defendant is married to Dianne's cousin Nary, and became her godfather on her 15th birthday in August of 1996. Their families were "really close," and Dianne often talked to defendant when they visited.

> A few months after her 15th birthday Dianne and her mother went from their home in Tracy to visit defendant and Nary in Livermore, where they lived with their young daughter Cynthia. While Dianne and her mother were talking with Nary in the kitchen, defendant entered and asked if she "wanted to go look at" his new exercise equipment in the garage. Dianne declined because she "didn't want nothing to happen," but defendant was insistent and she finally agreed to accompany him to the garage.

> The garage was through a door, which was left open, and two or three steps down from the kitchen. Dianne followed defendant, but stopped part way into the garage as he displayed the weights to her. Defendant repeatedly asked Dianne "to give him a hug." Although she was resistant, defendant told her "a hug wouldn't hurt nothing," so she "gave him a hug." Defendant grabbed Dianne "really tight and started brushing himself" on her. Dianne was able to feel his "private part" moving "up and down" against her. She pushed defendant away and asked, "What are you doing?" Defendant responded, "you know you like it." Dianne insisted that she "didn't," then retreated to the kitchen. She did not tell her mother or anyone else about the incident, but thereafter she tried to avoid defendant.

> Just after her 18th birthday in August of 1999, Dianne moved to Livermore to live with her aunt Nelly to attend a different high school. On the morning of August 28, 1999, Dianne was taken by her mother to defendant's house so he could drive her to Granada High School to register. Only defendant, his daughter Cynthia, and Dianne's

2

"baby nephew" were present at the house. Dianne was responsible for "baby sitting" her nephew that day.

Dianne briefly sat on the couch with the baby and watched television, but she "was tired," so defendant agreed to "watch the baby" for her while she rested in Cynthia's bedroom. Dianne closed the bedroom door, laid down on her stomach on the bed, and was "half way asleep" when she heard the door open and a "zipper go down." Dianne opened her eyes to see defendant in the room. He sat on the side of the bed, grasped her hand, and "swiped it" against "his private." Dianne sat up and told defendant to "let go," but he just said she "liked it." Defendant grabbed Dianne's arm, pushed her onto her back on the bed, and began "kissing" and "licking" her "everywhere" as he "pinned" her down with his hands and legs. Dianne yelled at defendant to "get off" as she squirmed and began "hitting him." Defendant repeated, "I know you like it." He lifted her shirt, removed her bra, pulled her pants off, and touched her "privates." Dianne continued to yell at defendant to "stop" and "get off" her. "He put his penis" in her "vagina" for "a few seconds," and Dianne realized that she "was all wet down there."

After defendant "got up," Dianne ran to the bathroom, crying, and noticed that she "was dripping blood." Dianne testified that she never experienced sexual intercourse before, and was frightened that she "was no longer a virgin." Before she left the bedroom, defendant directed Dianne "not to tell," and "promised it wouldn't happen again." He expressed to her that he "didn't want anybody to know what he did." Dianne cleaned herself in the bathroom, put on her clothes, and left the bedroom "to check up on the baby." Defendant went to his bedroom.

Later that morning, defendant drove Dianne to Granada High School to register. On the way, he "kept on promising" that "it wouldn't happen again," and implored her "not to tell." Defendant stated that he "had a daughter and he didn't want Nary finding out." Dianne considered reporting the assault to her parents and the police, but based upon a previous "incident that happened where [her] parents called the cops and later [she] found out that they dropped the charges," she "didn't want the same thin to happen again." Therefore, she did not tell anyone of the assault by defendant.

Dianne did not have any contact with defendant again until October 19, 1999, when he unexpectedly picked her up from school for lunch. When defendant arrived in his truck, Dianne "questioned why he was there." Defendant explained that Dianne's mother "told him to pick [her] up." Dianne stated, "I'm not going home with you." When defendant asserted, "well, what am I supposed to tell your mom? She's going to get mad," Dianne reluctantly got into the truck.

They stopped at Burger King to buy lunch, then proceeded to defendant's house. No one else was there. After Dianne ate her lunch, she called her friend Lindy and said she was alone in the house with defendant and "didn't want anything to happen." She asked Lindy to "stay on the phone" with her until she "had to go back to school." Lindy agreed, and they talked until Dianne "looked at the clock" and realized she needed a ride back to school.

Dianne searched the house for defendant, and found him in his bedroom. Defendant was lying on his bed, so Dianne yelled to him, "Jesse, get up. I got to go back to school." When she kicked the bottom of his shoe, defendant stood up, grabbed her hand, and swung her onto the bed. Dianne shouted, "Knock it off," but defendant "put his body weight" on her and pushed her onto the bed on her back. As defendant straddled her with his knees on her sides, he fondled and kissed her "all over." He

grabbed her breasts under her bra. She tried to push him away, and managed to prevent him from removing her clothes. Dianne warned defendant that she "wasn't going to stay quiet no more," and if she missed school she "was going to tell" her parents "what he was doing." Defendant then "jumped off" Dianne and drove her back to school. He again promised her "that it will never happen again."

When Dianne reached school, she ran to her friend Nancy, who observed that she was crying. Nancy asked "what happened?" several times before Dianne finally told her a relative "tried raping her" that day during lunch. Officer John Foxx, a school resource officer for the Livermore police department, noticed Dianne "crying hysterically, uncontrollably" while being consoled by another student on campus. Officer Foxx asked, "is there something I could do for you? Would you like to talk about it?" Dianne told him "nothing," but her friend Nancy convinced her to "to talk to him." Dianne then accompanied Foxx to his office, "still crying," but left for class without disclosing anything to him that day.

Foxx thereafter continued to encourage Dianne to "make a report on what happened to her." On October 29, 1999, Dianne told Foxx what occurred at lunch ten days before, but did not discuss any of the prior sexual assaults. She also advised Foxx that she "was ready" to press charges. Later the same day, defendant called Dianne at her aunt's house. Dianne advised him that she "was going to report him," and "press charges." Defendant stated that if she "did he would run away to Mexico" and never see his wife and daughter again, or "commit suicide."

Dianne later received a telephone call from defendant in which he stated, "I'm just calling you to apologize for what I did to you." Defendant did not "admit" what he had done, but repeatedly insisted that he wanted to "come over" to Dianne's house and apologize "face to face." Dianne "kept saying no" to him.

Dianne disclosed the telephone call from defendant to Detective Dave Dennis of the Livermore Police Department. Dianne subsequently called defendant from the Livermore Police Department to ask him "some questions" that Detective Dennis prepared for her. [FN1] During the conversation, defendant again apologized, and told Dianne that he confessed to the police but did not disclose to the officers everything that happened. When Dianne asked defendant to tell her what he did to her that day, he repeatedly said, "I don't want to say nothing on the phone."

FN1. A recording of the "pretext call" was played for the jury, and a transcription of it is part of the record.

Defendant testified in his defense that he did not sexually assault Dianne on any occasion. According to defendant, on August 28, 1999 Dianne was "dropped off" at his house with her "little nephew" at around 7:00 a.m., before he took her "to register at the school." While he was on the sofa, Dianne sat on his lap and put her hands around his neck. He though she "wanted something to do" with him, so he "told her this is not right," and pushed her away. Dianne called him a "faggot," whereupon he "pushed her to the floor." He later drove her to school. As to the incident on October 19, 1999, defendant testified that he picked up Dianne from school at her mother's request and took her to his home for lunch. About an hour later, he returned her to school. Defendant denied that he had any physical contact with Dianne that day. Defendant asserted that when he apologized to Dianne during subsequent phone calls, he was

United States District Court

For the Northern District of California

1   referring to the incident when he pushed her off his lap.

2                    **STANDARD OF REVIEW FOR HABEAS CORPUS**

3          Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this

4   Court may grant a petition challenging a state conviction or sentence on the basis of a claim that

5   was "adjudicated on the merits" in state court only if the state court's adjudication of the claim:

6   "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

7   clearly established Federal law, as determined by the Supreme Court of the United States; or (2)

8   resulted in a decision that was based on an unreasonable determination of the facts in light of

9   the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). Courts are not

10  required to address the merits of a particular claim, but may simply deny a habeas application

11  on the ground that relief is precluded by 28 U.S.C. § 2254(d). *Lockyer v. Andrade*, 538 U.S. 63,

12  70-73 (2003). It is the habeas petitioner's burden to show he is not precluded from obtaining

13  relief by § 2254(d). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

14         "Clearly established federal law, as determined by the Supreme Court of the United

15  States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of

16  the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000);

17  *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law

18  determined as of the time of the state court's last reasoned decision); *Alvarado v. Hill*, 252 F.3d

19  1066, 1068-69 (9th Cir. 2001). "Section 2254(d)(1) restricts the source of clearly established

20  law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. The Supreme Court

21  has repeatedly explained that AEDPA – which embodies deep-seated principles of comity,

22  finality, and federalism -- establishes a highly deferential standard for reviewing state-court

23  determinations. *See id.* at 436. Thus, the Court has emphasized that "[a] federal court may not

24  overrule a state court for simply holding a view different from its own, when the precedent from

25  [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per

26  curiam).

27

28                                              5

*United States District Court*
For the Northern District of California

1      Under § 2254(d)(1), a state court decision is "contrary to" clearly established United

2  States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth

3  in [Supreme Court] cases, 'or if it confronts a set of facts that are materially indistinguishable

4  from a decision'" of the Supreme Court and nevertheless arrives at different result. *Early v.*

5  *Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06). Under the "unreasonable

6  application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court

7  identifies the correct governing legal principle from the Supreme Court's decisions, but

8  unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at

9  413.

10      A federal habeas court "may not issue the writ simply because that court concludes in

11  its independent judgment that the relevant state-court decision applied clearly established

12  federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*

13  at 412. The objectively unreasonable standard is not a clear error standard. *Lockyer*, 538 U. S.

14  at 75-76; *Clark v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir.), *cert. denied*, 540 U.S. 968

15  (2003). After *Lockyer*, "[t]he writ may not issue simply because, in our determination, a state

16  court's application of federal law was erroneous, clearly or otherwise. While the 'objectively

17  unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of

18  deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." *Clark*,

19  331 F.3d at 1068.

20      In determining whether the state court's decision is contrary to, or involved an

21  unreasonable application of, clearly established federal law, a federal court looks to the decision

22  of the highest state court to address the merits of a petitioner's claim in a reasoned decision.

23  *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000); *Packer v. Hill*, 291 F.3d 569,

24  578-79 (9th Cir. 2002), *rev'd on other grounds*, 537 U.S. 3 (2002). The standard of review

25  under AEDPA is somewhat different where the state court gives no reasoned explanation of its

26  decision on a petitioner's federal claim and there is no reasoned lower court decision on the

27  claim. In such a case, a review of the record is the only means of deciding whether the state

28                                                    6

court's decision was objectively reasonable. *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Greene v. Lambert*, 288 F.3d 1081, 1088 (9th Cir. 2002).

A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *Rice v. Collins,* 126 S. Ct. 969, 975 (2006). A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption is not altered by the fact that the finding was made by a state court of appeal, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001).

Habeas relief is warranted only if the constitutional error at issue is structural error or had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). Under this standard, if the federal court determines that the state court's harmless error analysis was objectively unreasonable, and thus an unreasonable application of clearly established federal law, the federal court then proceeds to the *Brecht* analysis. *Id.* at 787.

### DISCUSSION

Petitioner argues that the trial court denied his right to due process and confrontation by barring evidence that Dianne had made an allegedly false prior accusation and by restricting cross-examination about the accusation. Petitioner also argues that the prosecutor's misconduct during closing argument violated his right to due process.

**1.     There was no Due Process Clause Violation in Preventing Petitioner From Introducing Evidence of Dianne's Prior Accusation.**

Petitioner argues that evidence regarding Dianne's past sexual conduct which pertained to her credibility was excluded at trial, and as a result, his due process rights were denied.

United States District Court
For the Northern District of California

1

**a.      The Exclusion of Dianne's Impeachment Evidence.**

2          Before trial, Petitioner moved for an order to introduce evidence regarding Dianne's

3    prior relevant sexual conduct.  (CT 94-95.)  This was a motion to introduce evidence which

4    purported to show that Dianne had falsely accused a relative, Ramon Valencia, of a rape or

5    other forcible sexual assault.  (Amended Petition at 2.)  Later at a pretrial hearing pursuant to

6    California Evidence Code § 402, Dianne testified that she had, through her father, reported

7    being sexually assaulted by Valencia as he gave her a ride home on November 17, 1997.  (RT

8    64-69.)  At the hearing, Dianne said that she had not told the police that Valencia had put his

9    penis into her vagina (RT 69), but she had felt a sharp pain between her legs.  (RT 70.)  Dianne

10   stated that she did not remember telling any person at the Tracy police department that she was

11   penetrated by a penis.  (RT 74-76.)  Following a police investigation, the police concluded that

12   a rape charge against Valencia was unsubstantiated.  (CT 173.)  However, they concluded that

13   another forcible sexual assault charge was substantiated:  penetration by a foreign object, such

14   as a finger.  (*Id.*)  On March 10, 2003, the trial court issued a decision barring introduction of

15   Dianne's prior sexual history for purposes of impeachment.  (CT 169-172.)  The court held that

16   there was "insufficient evidence arising from the 1997 incident in Tracy to challenge the

17   credibility of [Dianne] with evidence concerning her past sexual conduct."  (CT 173.)  Further,

18   the court concluded that even if there was enough evidence, such evidence is "at most tenuous

19   and the probative value of such evidence, if any, is minimal and greatly outweighed both by

20   undue consumption of court time and resources ... and by the public policy protecting a witness

21   from being unnecessarily publicly embarrassed and even savaged by such evidence."  (*Id.*)

22

**b.      Legal Standard for Due Process Violations.**

23          "State and federal rulemakers have broad latitude under the Constitution to establish

24   rules excluding evidence from criminal trials."  *Holmes v. South Carolina*, 547 U.S. 319, 324

25   (2006) (quotations and citations omitted); see also *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996)

26

27

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

(holding that due process does not guarantee a defendant the right to present all relevant evidence). This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. *Holmes*, 547 U.S. at 324. "While the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 325-26; *see also Egelhoff*, 518 U.S. at 42 (holding that the exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."). The defendant, not the state, bears the burden to demonstrate that the principle violated by the evidentiary rule "is so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Egelhoff*, 518 U.S. at 47 (internal quotations and citations omitted).

In deciding if the exclusion of evidence violates the due process right to a fair trial or the right to present a defense, the Court balances the following five factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004); *Drayden v. White*, 232 F.3d 704, 711 (9th Cir. 2000). The court must also give due weight to the state interests underlying the state evidentiary rules on which the exclusion was based. *See Chia*, 360 F.3d at 1006; *Miller v. Stagner*, 757 F.2d 988, 995 (9th Cir. 1985). Even if exclusion of the evidence amounts to constitutional error, in order to justify federal habeas relief, the erroneous exclusion must have had "a substantial and injurious effect" on the verdict. *Brecht,* 507 U.S. at 623. Habeas petitioners must therefore establish that the error resulted in "actual" prejudice. *See id.*

**c.     Exclusion of Evidence Did Not Violate Petitioner's Due Process Rights.**

The California Court of Appeal was the highest state court to address the merits of this claim in a reasoned decision.  Therefore, this Court looks to the analysis of the Court of Appeal in evaluating Petitioner's claim.  *See LaJoie*, 217 F.3d at 669 n.7.  Analyzing Petitioner's claim under the factors enumerated in *Chia* establishes that the Court of Appeal's decision was not an unreasonable application of Supreme Court precedent because the *Chia* factors weigh heavily in favor of the Respondent.

First, this Court will assess the probative value of the excluded evidence on the central issue.  Judicial discretion to exclude evidence "must bow to the due process right of a defendant to a fair trial and his right to present all relevant evidence of significant probative value to his defense."  *People v. Taylor*, 112 Cal. App. 3d 348, 364 (1980).  Petitioner argues that because Dianne falsely accused a family member of rape in the past, evidence of this prior false accusation is probative because it impeaches Dianne as a complaining witness.  Generally, California law provides that "opinion evidence, reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct, or any of that evidence, is not admissible by the defendant in order to prove consent by the complaining witness."  Cal. Evid. Code § 1103(c)(1).  However, California law does allow for the admission of evidence of prior sexual history if it attacks the credibility of the complaining witness.  *See* Cal. Evid. Code § 1103(c)(5).  Thus, if the prior sexual history evidence attacks Dianne's credibility, its exclusion was improper.

Petitioner points to another rape case, *People v. Burrell-Hart*, 192 Cal. App. 3d 593, 597-600 (1987), and urges that the Court of Appeal should have applied that holding to this case.  In *Burrell-Hart*, the trial court excluded evidence that tended to prove the petitioner's allegation that the complaining witness previously had falsely accused another man of physical abuse and threatened sexual abuse under circumstances very similar to that of the petitioner in that case.  *Id.* at 597.  Reversing this ruling, the California Court of Appeal held that the "evidence of prior allegedly false accusations [was] highly relevant" to whether or not the

United States District Court

For the Northern District of California

1   complaining witness "lied and would do again in similar circumstances." *Id.* at 600.  Therefore,

2   because such evidence was relevant to the complaining witness's credibility, its probative value

3   outweighed the public policy rationale against introduction of evidence that would have the

4   effect of humiliating the witness.

5           Petitioner's reliance on *Burrell-Hart*, however, is improper because in this case, there is

6   no such prior false accusation that Petitioner can point to in order to question Dianne's

7   credibility.  At the hearing on the admissibility of evidence relating to the Valencia matter, the

8   trial court found that Dianne had never explicitly reported a rape, but had reported a "non-

9   consensual, forcible act." (CT 171.)  Rather, it was her father and sister, who was Valencia's

10  girlfriend at the time, who used the term "rape." (CT 171.)  When Dianne was interviewed by

11  the investigating officer, the officer drafted a summary statement for review, which did not use

12  the term "rape." (*Id.*)   Further, although the world "rape" appears in the medical records, it is

13  not there as a result of any information received from Dianne herself. (CT 172.)  In other

14  words, "[e]veryone else seems to have been quick to call this a rape, but the victim never seems

15  to have so claimed." (*Id.*)  Based on this information, the California Court of Appeal held that

16  Petitioner:

17          failed to establish any fabrication of an accusation of sexual assault by Dianne.  She
            did not report to the police that Valencia raped her -- although her father and the
18          medical report mentioned the term "rape."   As the trial court found, Dianne's
            statement described a "non-consensual, forcible, sexual act," the precise nature of
19          which she apparently did not entirely recognize or comprehend.  She reported that
            Valencia "unbuttoned" her pants, and thereafter she felt "something go in" her, but
20          she "didn't know what it was" and did not refer "to it as a penis."  Dianne described
            a "sharp pain" between her legs, but she did not claim that a forcible rape occurred.
21          [Valencia] admitted that he opened the victim's pants and touched her pelvic area.
            Thus, the offer of proof showed a confused victim -- consistent with her lack of sexual
22          experience -- who made a rather ambiguous report of a sexual assault, but not a false
            accusation that demonstrated a propensity for untruthfulness."
23

24  *Morales*, No. A102884, 2004 WL 2850547, at *6.

25          In *Burrell-Hart*, there was evidence that was not admitted that would have spoken to

26  the complaining witness's credibility.  In this case, because Dianne never actually made a false

27

28                                                  11

accusation, introduction of this evidence would not have shown that Dianne had a propensity for untruthfulness. Dianne's credibility is not impugned by the admission of evidence regarding the Valencia matter, and therefore such evidence did not have any probative value. If evidence has no probative value whatsoever, it does not seem to matter whether the other *Chia* factors even apply. However, even if the evidence did have some probative value, the Court addresses the other *Chia* factors and finds that most of them weigh in favor of Respondent as well.

The reliability of the evidence and whether it is able to be evaluated by the fact finder intersected at the evidentiary hearing to determine the relevancy of the proposed sexual conduct evidence to attack Dianne's credibility. Dianne's testimony was given in court and under oath. Contending that the testimony was relevant, Petitioner had the opportunity to fully cross-examine Dianne. Dianne's testimony was consistent with other evidence in the case, as well as documents produced by officers investigating the Valencia matter, and was therefore reliable. Furthermore, it is clear that Dianne's testimony was able to be evaluated by the trier of fact.

Additionally, Dianne's testimony was not the sole evidence on the issue and did not constitute a major part of the attempted defense. On the issue of Dianne's credibility, Petitioner's counsel brought up other examples of her past to impeach her testimony. He attempted to confirm with Dianne that her parents kicked her out of their home and that she was a delinquent student that got kicked out of high school. (RT 227.) He also attempted to confirm with Dianne that her parents introduced her to a priest or a nun in Livermore so that she could go and "reform how [she was] living" because she was "running around with boys" in Texas. (RT 228.) Furthermore, Petitioner's counsel repeatedly questioned her about inconsistencies in her testimony and the discrepancies between her various police reports and her testimony in court. (*See, e.g.*, RT 232, 279-80, 285.) As there was ample evidence available to attack Dianne's credibility in this case, the trial court held that the additional evidence of the Valencia matter was inadmissible because it could not have been used to impeach Dianne and therefore had no probative value.

In order to obtain habeas relief on the basis of an evidentiary error, a petitioner must

12

United States District Court

For the Northern District of California

1    show that the error was one of constitutional dimension and that it was not harmless under

2    *Brecht*, 507 U.S. at 637.  Petitioner would have to show that the error had "'a substantial and

3    injurious effect' on the verdict."  *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting

4    *Brecht*, 507 U.S. at 623).  Even if the evidence of the Valencia matter was unconstitutionally

5    excluded, Petitioner would still not have suffered actual prejudice.  As Dianne's prior sexual

6    history with Valencia did not impeach her or establish that she had a propensity for

7    untruthfulness, admission of her prior sexual history would not have changed the verdict in any

8    way.  In light of this finding, it cannot be said that the trial court's exclusion had a "substantial

9    and injurious effect" on the verdict.

10          **2.     There Was No Confrontation Clause Violation in Preventing Petitioner
                     From Cross-Examining Dianne.**

11                **a.     Questioning Referring to the Valencia Matter During Trial.**

12          During trial, the prosecutor asked Dianne about the Valencia matter to show why she

13   delayed reporting the August 28, 1999 alleged rape to the police.  (RT 180.)  Dianne referred to

14   another "incident that happened where [her] parents called the cops and later [she] found out

15   that they dropped charges."  (*Id.*)  When Petitioner's counsel expressed the intention to cross-

16   examine Dianne about the Valencia matter, the trial court did not allow it, on the grounds that

17   Dianne's testimony did not mention that sex was involved, or that she was even the alleged

18   victim in the Valencia matter.  (RT 214.)  Thus the court found that the only issue that was

19   available for cross-examination regarding the Valencia matter was that "a complaint was made

20   by her parents which they later withdrew or asked not to prosecute."  (*Id.*)  After this ruling,

21   when Petitioner's counsel cross-examined Dianne about the delay between the rape and her

22   report of it, Dianne mentioned the dropping of the charges, but the trial court would not allow

23   further questioning as to what she meant.  (RT 246, 248.)

24

25                **b.     Legal Standard for Confrontation Clause Violations.**

26          The Confrontation Clause of the Sixth Amendment provides that in criminal cases the

27   accused has the right to "be confronted with witnesses against him."  U.S. Const. amend. VI.

28

1    The federal confrontation right applies to the states through the Fourteenth Amendment.

2    *Pointer v. Texas*, 380 U.S. 400, 403 (1965).  The ultimate goal of the Confrontation Clause is to

3    ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.

4    *Crawford v. Washington*, 541 U.S. 36, 61 (2004).  It commands, not that evidence be reliable,

5    but that reliability be assessed in a particular manner: by testing in the crucible of cross-

6    examination.  *Id.*; *see Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (a primary interest secured

7    by the Confrontation Clause is the right of cross-examination).  The Clause thus reflects a

8    judgment, not only about the desirability of reliable evidence, but about how reliability can best

9    be determined.  *Crawford*, 541 U.S. at 61; *see, e.g., United States v. Medjuck*, 156 F.3d 916,

10   919

11   n.1 (9th Cir. 1998) (holding that the Confrontation Clause serves the purposes of ensuring that

12   witnesses will testify under oath, forcing witnesses to undergo cross-examination, and

13   permitting the jury to observe the demeanor of witnesses); *Wood v. Alaska*, 957 F.2d 1544,

14   1549 (9th Cir. 1992) (the right to confrontation includes the right to cross-examine adverse

15   witnesses and to present relevant evidence).

16        The right to cross-examine includes the opportunity to show not only that a witness is

17   biased, but also that the testimony is exaggerated or otherwise unbelievable.  *Fowler v.*

18   *Sacramento County Sheriff's Dept*, 421 F.3d 1027, 1035 (9th Cir. 2005) (quoting *Pennsylvania*

19   *v. Ritchie*, 480 U.S. 39, 51-52 (1987) (plurality opinion)).  Even if cross-examination is not

20   certain to affect the jury's assessment of the witness's reliability or credibility it may implicate

21   the Sixth Amendment right to confrontation if "a jury 'might reasonably' have questioned the

22   witness's reliability or credibility in light of the cross-examination."  *Id.* (quoting *Delaware v.*

23   *Van Arsdall*, 475 U.S. 673, 679 (1986)).

24        The Confrontation Clause does not prevent a trial judge from imposing reasonable

25   limits on cross-examination based on concerns of harassment, prejudice, confusion of issues,

26   witness safety or interrogation that is repetitive or only marginally relevant.  *Id.*  The

27   Confrontation Clause guarantees an opportunity for effective cross examination, not cross

28                                                   14

examination that is effective in whatever way, and to whatever extent, the defense might wish. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam); *see also Coleman v. Calderon*, 150 F.3d 1105, 1112 (9th Cir. 1998) (holding that the Confrontation Clause does not require that the prosecutor disclose evidence that will help the defense effectively cross-examine a prosecution witness), *rev'd and remanded on other grounds*, 525 U.S. 141, 147 (1998).

To determine whether a criminal defendant's Sixth Amendment right to confrontation has been violated by the exclusion of evidence on cross-examination, a court must inquire whether: (1) the evidence was relevant; (2) there were other legitimate interests outweighing the defendant's interests in presenting the evidence; and (3) the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness. *United States v. James*, 139 F.3d 709, 713 (9th Cir. 1998) (quoting *Wood v. Alaska*, 957 F.2d at 1549-1550); *see, e.g., Fowler*, 421 F.3d at 1041 (right to confrontation violated where trial court precluded cross-examination of victim, in prosecution for annoying or molesting a minor, as to prior accusations she had made); *United States v. Schoneberg*, 396 F.3d 1036, 1043 (9th Cir. 2005) (right of confrontation violated when trial court prevented defense from using cross to make a record from which to argue why the witness might be biased).

For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. *Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht*, 507 U.S. at 637).

      **c.**      **The Prohibition Against Cross-Examination Regarding the Valencia Matter did not Violate Petitioner's Right to Confrontation.**

The California Court of Appeal is the highest state court to address the merits of this claim in a reasoned decision. Therefore, this Court looks to the analysis of the Court of Appeal in evaluating Petitioner's claim. *See LaJoie*, 217 F.3d at 669 n.7. Analyzing Petitioner's claim under the factors enumerated in *James* establishes that the Court of Appeal's decision was

1    neither contrary to clearly established federal law, nor an unreasonable application of Supreme

2    Court precedent.

3        Addressing the first prong in *James*, this Court finds that the evidence of the Valencia

4    matter was not relevant because it did not tend to make any fact that was of consequence to the

5    determination of the state trial court action more or less probable than it would be without the

6    evidence. *See* Fed. R. Evid. 401. In this case, Petitioner did not raise Dianne's consent as a

7    defense. Rather, he argued that the sexual encounter never occurred and that when Dianne sat

8    on his lap made sexual overtures towards him, he pushed her off of his lap. (RT 369-371.)

9    Petitioner sought to introduce evidence of the Valencia matter solely to impeach Dianne as a

10   witness. However, as was discussed *supra*, evidence relating to the Valencia matter does not

11   have any bearing on Dianne's credibility as a witness because she did not make false

12   accusations of rape. As such, there is no fact of consequence to the determination of the state

13   trial court action that would be more or less probable with the admission of the Valencia matter

14   evidence. Therefore, the evidence is not relevant.

15       Even if the evidence were relevant, there were legitimate interests outweighing the

16   Petitioner's interests in presenting the evidence. California Evidence Code § 1103(c)(1)

17   provides that "opinion evidence, reputation evidence, and evidence of specific instances of the

18   complaining witness' sexual conduct, or any of that evidence, is not admissible by the

19   defendant in order to prove consent by the complaining witness." As a matter of public policy,

20   the rape shield provisions of California Evidence Code § 1103 were enacted to "avoid the

21   harassment which has traditionally plagued complaining witnesses" in rape cases. *People v.*

22   *Rioz*, 161 Cal. App. 3d. 905, 916 (1984). The statute "properly prevents the victim of sexual

23   assault from being herself placed on trial." *Id.* As evidence of the Valencia matter would not

24   operate to impeach Dianne and the Petitioner did not assert consent as a defense, California's

25   interests in protecting complaining witnesses in rape cases far outweighs Petitioner's interests in

26   presenting the evidence.

27

28

1    Even though evidence related to the Valencia matter was excluded, the jury was

2    nevertheless left with sufficient information to assess the credibility of the witness.  As

3    discussed *supra*, Petitioner's counsel repeatedly questioned Dianne about her background in an

4    effort to cast her as a troubled young person.  The Court of Appeal held that the "prior sexual

5    assault report evidence offered by defendant had such minimal probative value that no different

6    impression of the victim's credibility would have been obtained had it been admitted,

7    particularly give the otherwise thorough cross-examination of the witnesses undertaken by the

8    defense."  *Morales*, No. A102884, 2004 WL 2850547, at *10.  Thus, there was enough

9    testimony introduced during trial that would have allowed the jury to draw a conclusion as to

10   Dianne's credibility.

11       Lastly, Petitioner contends that the holding of *Fowler*, 421 F.3d at 1030, a Ninth

12   Circuit case, should apply here.  In *Fowler*, Charla Lara alleged that Jeff Fowler touched her

13   thighs, groin, breasts, and nipples while applying lotion to her body and held a sexually explicit

14   conversation with her.  *Id.* at 1031.  Before trial, the State moved to prevent Fowler from cross-

15   examining Lara and offering evidence regarding two incidents of molestation that Lara claimed

16   to have suffered about six years before the incident with Fowler.  *Id.* at 1032.  In the first

17   incident, Lara claimed that Tommy Filson, an acquaintance of her mother, grabbed her crotch

18   and touched her butt.  *Id.*  Although Filson was ultimately charged with committing lewd and

19   lascivious acts on both Lara and a friend, Filson was convicted of committing lewd and

20   lascivious acts only as to the friend.  *Id.* at 1032 n.3.  In the second incident, Lara reported that

21   Steven Hendrix "put his hand between her legs on her private part and squeezed about four

22   times."  *Id.* at 1032.  The Bakersfield Police Department concluded that the case was

23   "unfounded" partly because Lara's mother contradicted Lara's testimony.  *Id.*  Lara later went

24   on to state that she may have overreacted and exaggerated the Hendrix incident, saying that she

25   was just "a little cautious about things" and that she did not think the Hendrix incident "was that

26   big of a deal" in retrospect.  *Id.*  The trial court precluded the evidence because it found that

27   there was no indication that Lara actually lied, and that countervailing interests such as

28                                                    17

United States District Court

For the Northern District of California

confusion of the jury, prejudicial effect of the evidence, and consumption of court time in introducing the evidence outweighed the probative value of the evidence. *Id.* at 1033.

The Ninth Circuit found that based on this evidence, along with the fact that Lara's mother contradicted Lara, "a jury very well might reasonably have concluded that Lara ... tended to misinterpret or misperceive the conduct, overreact, and then perhaps unconsciously, exaggerate or embellish in recounting the conduct so as to fit her subjective misinterpretation or misperception." *Id.* at 1038-39. Next, the Ninth Circuit held that instead of precluding all evidence, the trial court should have placed "reasonable restrictions" on the cross-examination. *Id.* at 1040. Further, the Ninth Circuit held that the court's concerns about waste of time, confusion, and prejudice were not sufficiently well-founded and that the error was not harmless, and therefore, Fowler's rights to confrontation had been violated. *Id.* at 1041.

*Fowler* is distinguishable on the facts of that case. First, before Fowler's trial, Lara made self-impeaching statements that cast doubt upon her credibility as a witness. In this case, Dianne never made such statements. As discussed, everyone *but* Dianne concluded that the Valencia incident was a rape, even though she never explicitly stated as such, and at the evidentiary hearing she made certain that she did not accuse Valencia of penetrating her. Second, in *Fowler*, there was testimony from Lara's mother directly contradicting Lara's recollection of the prior events. In this case, there is significant testimony corroborating Dianne's state of mind the day of the incident. Third, in *Fowler*, although there was cross-examination regarding Lara's shoplifting habits, there was none that "bore on Lara's reliability and credibility in the specific context before the jury." *Id.* at 1043. In this case, Petitioner's counsel cross-examined Dianne about her pregnancy and accused her of "running around with boys." Fourth, in *Fowler*, the trial court precluded all questioning regarding the two prior incidents, which the Ninth Circuit found unreasonable. In this case, although the trial court limited the scope of cross-examination to what was brought up on direct, the jury still was able to hear testimony about a prior incident wherein Dianne was not believed. Fifth, in *Fowler* there was no additional evidence beyond testimony of the parties and therefore any evidence

18

United States District Court

For the Northern District of California

1    relating to Lara's credibility was significant.  In this case, there was additional evidence, such as

2    the pretext phone call.  Therefore, the case is factually distinguishable and Petitioner's reliance

3    on *Fowler* is inappropriate here.

4         Since the excluded evidence was not relevant, its admission was outweighed by other

5    interests, and its exclusion did not prevent the jury from assessing the credibility of the witness,

6    it was not a violation of Petitioner's right of confrontation to exclude the evidence.

7

8         **3.    The Trial Court's Cross-Examination Restriction Did Not Violate
               Petitioner's Due Process Rights.**

9         Petitioner asserts that his due process rights were violated when the trial court

10   prevented him from cross-examining Dianne about the Valencia matter.  This Court may only

11   disturb a state court's procedural or evidentiary ruling on due process grounds only if the ruling

12   was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *See Walters v.*

13   *Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.

14   1986).  This Court cannot conclude that the restriction on cross-examination regarding the

15   Valencia matter in this case is fundamentally unfair.  First, pursuant to California Evidence

16   Code § 782, Petitioner was afforded an opportunity to offer proof of Dianne's lack of credibility

17   and an opportunity to cross-examine her regarding the Valencia matter.  Second, the holding in

18   *Jennings v. Superior Ct.*, 66 Cal. 2d 867, 879 (1967), does not apply here because in that case,

19   the defendant sought to introduce a defense through cross-examination.  Here, Petitioner did not

20   seek to introduce a defense, but rather sought to merely impeach the witness, which he was able

21   to do without asking her about the Valencia matter .  Third, and most importantly, as the

22   California Court of Appeal noted, the "prosecution did no more than comply with the trial

23   court's evidentiary ruling by adducing the victim's testimony that her reluctance to report the

24   first two assaults by defendant was caused by apprehension associated with her prior experience

25   of a reported sexual assault that was never prosecuted."  *Morales*, No. A102884, 2004 WL

26   2850547, at *8.  The door to cross-examination was not opened and therefore, when the

27

28                                              19

1    Petitioner was restricted from cross-examining Dianne about her prior sexual history, his due

2    process rights were not violated.

3         Even if there was a due process violation, the Petitioner has not shown that the error

4    had "a substantial and injurious effect on the verdict." *See Dillard,* 244 F.3d at 767 n.7 (quoting

5    *Brecht*, 507 U.S. at 623).  The excluded evidence would not have impeached Dianne as a

6    witness because it did not show that she had a propensity for untruthfulness.

7

8    **4.    The Prosecutor's Closing Argument did not Violate Petitioner's Due Process Rights.**

9         **a.    The Prosecutor's Remarks Regarding Petitioner's Daughter.**

10        During trial Petitioner's counsel noticed that Cynthia, Petitioner's daughter and a

11   potential witness in the case, was in the courtroom during Dianne's cross-examination.  (RT

12   260-62.)  During closing arguments, the prosecution stated:

13        Why was she here in the building listening to such horrible, horrible things about her
          father?  Because he wants your sympathy.  Because he cares far more about himself,
14        far more about himself than he does the well being of his own daughter.  I think that's
          pathetic that a man would make a prop out of his ten-year-old daughter.

15   (RT 410.)  Petitioner contends that this was prosecutorial misconduct and a violation of his due

16   process rights.

17        **b.    Legal Standard for Prosecutorial Misconduct.**

18        Prosecutorial misconduct is cognizable in federal habeas corpus proceedings.  The

19   appropriate standard of review is the narrow one of due process and not the broad exercise of

20   supervisory power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due

21   process rights are violated when a prosecutor's misconduct renders a trial "fundamentally

22   unfair."  *See id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process

23   analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

24   culpability of the prosecutor").  Federal habeas relief for claims of prosecutorial misconduct is

25   appropriate only if the misconduct has a substantial and injurious effect or influence in

26   determining the jury's verdict.  *See Brecht*, 507 U.S. at 637.

27

28                                              20

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**c.    Petitioner's Prosecutorial Misconduct Claims Are Procedurally Barred.**

Even though the Court of Appeal agreed with Petitioner that the prosecutor's argument was improper, it held that the Petitioner's claim for prosecutorial misconduct was procedurally barred. *Morales*, No. A102884, 2004 WL 2850547, at *10.  This holding was not contrary to established federal law, but rather, was in accordance with it.  The Supreme Court has held that according to the independent and adequate state ground doctrine, federal courts will not review questions of federal law decided by a state court "if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  This rule applies whether the state law ground is substantive or procedural.  *Id.*  The Court held that this "doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement.  In these cases, the state judgment rests on independent and adequate state procedural grounds." *Id.* at 729-730 (citing *Wainwright v. Sykes*, 433 U.S. 72, 81, 87 (1977); *Ulster County Court v. Allen*, 442 U.S. 140, 148 (1979)).

In California, "as a general rule, a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion – and on the same ground – the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." *People v. Hill*, 952 P.2d 673, 682 (1998).  However, a "defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile." *Id.* (citing *People v. Arias,* 13 Cal. 4th 92, 159 (1996); *People v. Noguera*, 4 Cal. 4th 599, 638 (1992)).  Petitioner argues that the prosecutor presented false evidence by offering an inference in closing argument that he knew to be false or had very strong reason to doubt.  (Amended Petition, Memorandum of Points and Authorities at 12.)  Petitioner claims that in this case the prosecutor asked the jury to conclude that the Petitioner asked his daughter to come to court for the purpose of eliciting sympathy from the jury because he cares more about himself than the well-being of his daughter.  However, upon hearing this during the

**United States District Court**
For the Northern District of California

1   prosecutor's closing argument, Petitioner's counsel did not make a timely objection or request

2   that the jury be admonished as to the prosecutor's statements.  Now Petitioner claims that he

3   should be excused from the necessity of a timely objection or admonishment because it would

4   "likely have resulted in a useless instruction that 'argument is not evidence' that would not have

5   cured the harm."  (*Id.* at 13.)

6           The California Supreme Court faced a similar situation in *People v. McLain*, 46 Cal. 3d

7   97, 112-13 (1988) (*abrogated in part on other grounds by Calderon v. Coleman*, 525 U.S. 141,

8   145 (1998)).  In *McLain*, the prosecutor implied that the defense counsel solicited false

9   testimony from a witness to, which defense counsel objected.  *Id.*  At the request of defense

10   counsel, the trial court admonished the jury that no such inference was intended by the

11   prosecution, and that they were the sole judges of the credibility of all witnesses who testified in

12   that case.  *Id.*  On appeal, the California Supreme Court held that although the prosecutor's

13   comment was improper, the comment was brief in relation to the prosecutor's argument and

14   went to a matter that was relatively insignificant, so the admonishment was sufficient to prevent

15   harm.  *Id.*  In the present case, the prosecutor's comment, although arguably improper, was

16   short compared to the rest of his argument.  Further, it went to an issue secondary to that of

17   Petitioner's guilt.  Therefore, the Court of Appeal was proper in concluding that a timely

18   objection and jury admonishment could have avoided any harm to the Petitioner.  As such,

19   because Petitioner failed to raise such an objection and admonishment, he is barred from

20   complaining on appeal of prosecutorial misconduct.  *Hill*, 952 P.2d at 682.

21                                **CONCLUSION**

22           After a careful review of the record and pertinent law, the petition for writ of habeas

23   corpus is DENIED.  The Clerk shall enter judgment in favor of Respondent and close the file.

24           **IT IS SO ORDERED.**

25   Dated:  November 25, 2008                    _____

26                                               JEFFREY S. WHITE
                                                 UNITED STATES DISTRICT JUDGE

27

28                                           22